**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**EUGENE DIVISION**

LELAND LAIDLAW,

    Plaintiff,           Case No. 6:13-cv-1925-ST

  v.               **OPINION AND ORDER**

COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION,

    Defendant.

**STEWART, Magistrate Judge**.

    Plaintiff, Leland Laidlaw ("Laidlaw"), seeks judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying his applications

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under

Titles II and XVI of the Social Security Act.  This court has jurisdiction under 42 USC § 405(g)

and § 1383(c).  All parties have consented to allow a Magistrate Judge to enter final orders and

judgment in this case in accordance with FRCP 73 and 28 USC § 636(c) (docket #8).

Because the Commissioner's decision is not supported by substantial evidence, it is reversed and remanded for an award of benefits.

## ADMINISTRATIVE HISTORY

Laidlaw filed applications for SSI and DIB on June 11, 2010, alleging disability as of May 14, 2009.  Tr. 158-71.[1]  After the Commissioner denied his applications initially and upon reconsideration, Laidlaw requested a hearing before an Administrative Law Judge ("ALJ").  Tr. 70-86.  Laidlaw appeared before ALJ Stuart Waxman at hearings held on March 14 and July 13, 2012.  Tr. 29-65.  On July 21, 2012, the ALJ issued a decision finding Laidlaw not disabled.  Tr. 13-23.  The Appeals Council denied Laidlaw's subsequent request for review on September 9, 2013 (Tr. 1-4), making the ALJ's decision the final Agency decision.  This appeal followed.

## FACTS

### I.    Background

Born in 1964, Laidlaw was 48 years old at the time of the hearings.  Tr. 48.  He left high school in the 11th grade and has past work experience as a dish washer, a bouncer, a welder, a cleanup worker, a landscaper, and a carpenter.  Tr. 33-36.

### II.    Medical Evidence

In June 2009, Laidlaw sought emergency treatment for sciatic pain after being involved in a motor vehicle accident several weeks earlier.  Tr. 298.  The physician believed that he likely had a herniated disk and diagnosed sciatica.  Tr. 299.  Laidlaw established care with Kathie J. Lang, M.D., who referred him to physical therapy and prescribed pain medications.  Tr. 288, 296.  He continued to have pain, and an MRI revealed moderate degenerative disc narrowing at

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed on April 7, 2014 (docket #15).

L4-L5 and a broad-based disc herniation at L5-S1 with impingement of the left L5 nerve root.

Tr. 285, 290.

Dr. Lang referred Laidlaw for an orthopedic evaluation. Tr. 339. Karl Wenner, M.D., an orthopedic surgeon, evaluated Laidlaw on July 30, 2009. Tr. 337. At that time, Laidlaw reported "bouts of occasional extreme left leg pain," discomfort in any position, and feeling "quite miserable." Tr. 339. Dr. Wenner adjusted the pain medications, scheduled an epidural steroid injection, and absent any improvement, stated that he would schedule an L5-S1 left-sided microdiskectomy. Tr. 340.

Laidlaw received physical therapy 15 times over 90 days from June through September 2009. Tr. 305-24. Although he missed some scheduled visits, he was "starting to respond better" by mid-August. Tr. 318.

In September 2009, Dr. Wenner noted a positive straight leg raise on the left, paresthesias in the lateral side of the leg and dorsum of the foot, some weakness, and decreased reflexes. Tr. 337. He wrote that Laidlaw had a disc herniation with significant involvement of the L5-S1 foramen and a very broad-based bulge. *Id.* He believed that Laidlaw was a candidate for surgical intervention because two epidural injections had failed to alleviate his condition. *Id.*

On October 15, 2009, Dr. Wenner performed a minimally invasive microdiskectomy at L5-S1. Tr. 349-50. Laidlaw did well after the operation for a few days, but his leg pain soon returned. Tr. 336, 345. An MRI revealed a recurrent disc herniation impinging on the exiting L5 nerve root. Tr. 345, 355-56. Due to severe discomfort, Laidlaw elected to have a second microdiskectomy. Tr. 333, 345.

On January 4, 2010, Dr. Wenner performed a re-exploration and microdiskectomy at L5-S1. Tr. 346. The nerve root was "extremely swollen" with a disc protrusion beneath. *Id.* After

surgery, Laidlaw continued to report pain.  Tr. 331.  The following month, Dr. Wenner advised

Laidlaw to increase his activity as tolerated.  Tr. 330.  By May 28, 2010, however, Laidlaw was

"still very uncomfortable."  Tr. 327.  Although Dr. Wenner noted objective improvement with no

definite paresthesias and a mild straight leg raise, he noted that Laidlaw "subjectively is still

uncomfortable."  *Id.*  Dr. Wenner again advised Laidlaw to increase his activity as tolerated.  *Id.*

By March 2010, Laidlaw was "doing quite a bit better," but began having leg pain again.

Tr. 329.  Based on a new MRI that did not show a recurrent or new disc herniation, Dr. Wenner

approved a diagnosis of Laidlaw in April 2010 with status post L5-S1 microdiskectomy with

persistent left leg radiculitis due to chemical radiculitis.[2]  Tr. 328.  Because Laidlaw had an

adverse reaction to steroids, Dr. Wenner prescribed Neurontin and a foraminal injection to

relieve his pain.  *Id.*  Having "run out of other options," he considered a pain referral if Laidlaw

showed no improvement.  *Id.*

In May and July 2010, Dr. Wenner noted that Laidlaw was "still pretty uncomfortable"

with pain radiating into his leg and feeling unsteady when walking.  Tr. 326-27.  While his

function had improved overall, Laidlaw could not "do anything vigorous and could not return to

his work as a welder."  Tr. 326.  Dr. Wenner noted that Laidlaw got around the room reasonably

well, had a negative straight leg raise, except for tight hamstrings, and had a markedly positive

spring test in the lower lumbar spine.  *Id.*  He diagnosed persistent radiculitis and mechanical

back pain after two disc herniations.  *Id.*  Because he had nothing surgical to offer and Laidlaw

had no medical insurance to cover physical therapy, he recommended a conditioning program.

*Id.*

---

[2] Chemical radiculitis is an inflammatory condition of the nerve root due to the rupture of the annulus fibrosus and dissemination of disk fluid along the nerve root sheath.  http://www.ncbi.nlm.nih.gov/pubmed/608297.

By letter dated July 23, 2010, Dr. Wenner stated that "despite appropriate treatment" now focused on a "conditioning program" and "nonsteroidal anti-inflammatory medicines," Laidlaw "continues to have persistent pain and discomfort and inability to do significant work." Tr. 325. He projected that Laidlaw's condition would preclude gainful employment for the next six months to a year. *Id.*

In the fall of 2010, Laidlaw returned to Dr. Wenner. Tr. 461. His condition had not changed; he had good days and bad days, was taking narcotic analgesics, and had a positive straight leg raise. *Id.*

In November 2010, Dr. Wenner ordered another MRI, which revealed scarring in the nerve area, but no recurrent disc herniation. Tr. 461. The following month, he referred Laidlaw for an evaluation for a possible spinal cord simulator. Tr. 460. He opined that Laidlaw was neurologically intact, but had a positive straight leg raise and popliteal compression tests. *Id.*

In January 2011, Laidlaw was examined by Viviane Ugalde, M.D., at The Center, Orthopedic and Neurosurgical Care and Research. Tr. 432-35. Dr. Ugalde diagnosed lumbar neuritis; postlaminectomy syndrome (lumbar), and lower back pain. Tr. 425. Prior to considering spinal cord stimulation, she recommended a SPECT scan to rule out alternative treatment courses. Tr. 435.

In February 2011, Dr. Wenner completed a form regarding Laidlaw's condition and opined that his recurrent herniated nucleus pulposus with persistent radiculitis could be expected to last at least 12 months. Tr. 424. He wrote that Laidlaw experienced back pain and left leg pain with weakness in the left leg and noted a positive straight leg raise in the left leg and an MRI showing epidural fibrosis. Tr. 425. Dr. Wenner opined that Laidlaw must lie down or rest periodically during the day every one to two hours due to his back and leg pain, could stand and

walk at least two, but less than six, hours and sit for less than six hours in an eight-hour workday with normal breaks. *Id.*

On March 2, 2011, Laidlaw was examined by Jon N. Swift, Jr., D.O., at The Center to continue the spinal cord stimulator assessment. Tr. 427. Laidlaw reported taking various medications which had not worked or could not be tolerated and also engaging in physical therapy which worsened his pain. *Id.* Dr. Swift noted that Laidlaw's lumbar range of motion was diminished in all planes and provocative with twisting and extension which caused left-sided back and leg pain. Tr. 428. Lumbar facet loading maneuvers and straight leg raise were positive on the left. *Id.* Laidlaw's gait was antalgic. Tr. 429. A SPECT (single photon emission computed tomography) scan showed increased tracer activity at the L4-5, L5-S1 disc space, consistent with active degenerative disc disease, and worse at L5-S1. *Id.* Dr. Swift found that would be reasonable to proceed with a medial branch block. Tr. 430. If the branch block did not provide pain relief, he would consider a spinal cord stimulator trial. *Id.* The next day, Dr. Swift administered the medial branch block. Tr. 449. After several days of relief, the pain returned. Tr. 464.

On August 4, 2011, in a letter referring Laidlaw to another physician, Dr. Wenner reported that The Center believed Laidlaw was a candidate for an electrical stimulator trial, but had not been successful in getting it approved by the insurance company. Tr. 459. Since he did not have anything surgical to offer, he believed "that the electrical stimulator may be the only option" and that Laidlaw "may require some degree of narcotic treatment on a chronic basis "as long as he is not escalating his use." *Id.* Dr. Wenner also noted that Laidlaw was neurologically intact with radicular pain with straight leg raise. *Id.*

In April 2012, at the request of the agency, Laidlaw was examined by Raymond P. Nolan, M.D., Ph.D., a cardiologist and internal medicine specialist. Tr. 464. Laidlaw reported that he had not been able to pursue the implantable stimulator because the cost was prohibitive. *Id*. He also reported that in a comfortable position in a chair, he could sit for 30 to 45 minutes and could walk one-half to one mile. *Id*. He spent most of his day standing and moving about. *Id*.

Dr. Nolan noted that Laidlaw had a slightly antalgic gait. Tr. 465. Sensation in his lower extremities was decreased, specifically in the thigh and calf and a portion of the left foot. Tr. 466. Dr. Nolan diagnosed chronic low back pain, status post-surgical procedures, with chronic left sciatic symptoms and residual sensory deficit. *Id*. He found that Laidlaw presented as a credible examinee outside of the discrepancy between observed and measured lumbar flexion capability. *Id*. Dr. Nolan wrote that Laidlaw should minimize bending, twisting and turning, and limit lifting and carrying to 10 pounds on a frequent basis and 20 pounds on occasion. *Id*. He translated Laidlaw's own statements into an ability to sit "at least six hours in an eight hour day, with opportunity for position change as needed for comfort" and an ability to stand and/or walk at least four hours in an eight-hour day. *Id*.

### III.    **Laidlaw's Testimony**

At the hearing, Laidlaw testified that sciatic nerve pain prevents him from working. Tr. 55-57. He described the pain as a constant dull ache that occasionally becomes a shooting pain when he turns his body. Tr. 57. He cannot stand or sit for long periods of time or bend over. *Id.* Laidlaw stated that he lacked medical insurance and, therefore, could not attain the recommended treatment of a stimulator implant, see a doctor, or afford pain medication. Tr. 63.

Laidlaw testified that "a lot of walking" and "trying to carry things" made his pain worse. Tr. 58. He attempts to do household chores until he becomes sore and cannot move. Tr. 59, 62. He can sit for 10 to 15 minutes without moving and stand for a long time if he could shift back and forth or change positions. Tr. 61-62. He can walk about half an hour, but walks up and down stairs with difficulty and has pain when he picks something off the floor. *Id.* When he is too sore and cannot move, he must sit down or lie down. Tr. 62. He often spends half an hour trying to find a comfortable position. *Id.*

## IV.    Vocational Expert's Testimony

The ALJ asked the Vocational Expert ("VE") to consider a person who could occasionally lift 10 pounds, stand and walk for two hours, and sit for up to six hours, in an eight-hour day with normal breaks. Tr. 38. He would have to avoid even moderate exposure to poorly ventilated areas, environmental irritants such as smoke, fumes, odors, dusts, gasses and unprotected heights or walking on uneven terrain. *Id.* He would have to avoid even moderate use of moving machinery. The VE testified that such a person could not perform any of Laidlaw's past relevant work, but could work as a bonder in electronics, a touch up screener, a table worker, or spotter. Tr. 38-39.

Next, the ALJ asked the VE to consider a hypothetical person who could occasionally lift 20 pounds and frequently lift 10 pounds, stand and walk for six hours and sit for up to six hours in an eight-hour day with normal breaks. Tr. 38. He could occasionally climb ladders, ropes and scaffolds, ramps and stairs; occasionally stoop, kneel, and crouch; never crawl; frequently push or pull bilaterally and occasionally operate foot controls bilaterally; frequently reach overhead; and avoid concentrated use of moving machinery. Tr. 39. The VE testified that such a person

could not perform Laidlaw's past relevant work, but could work as a counter clerk, a laundry folder, or a ticket clerk. Tr. 40.

On cross-examination, the VE was asked to add to the first hypothetical that the person needed an opportunity to sit and stand during the workday. Tr. 41. The VE testified that a sit-stand accommodation would be allowable on the jobs he had identified. *Id.* However, a person who needed to lie down at unscheduled times during the workday for half an hour to relieve pain could not perform these positions. Tr. 41-42. The need to lie down would rule out all work. Tr. 42.

## **DISABILITY ANALYSIS**

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii)

& (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR §§ 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id*.  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g), 416.960(c).

## ALJ'S FINDINGS

At step one, the ALJ found that Laidlaw had not engaged in substantial gainful activity after his alleged onset date of May 14, 2009.  Tr. 15.  At step two, the ALJ found that Laidlaw has the severe impairments of arthrosis and degenerative disc disease at L4-S1, and status post microdiskectomies at L5-S1.  *Id*.  At step three, the ALJ found that Laidlaw did not have an

impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 16.

The ALJ next assessed Laidlaw's residual functional capacity ("RFC") and determined that he could perform work with the following limitations:  lift and carry up to 10 pounds occasionally; stand and walk for 2 hours in an 8-hour workday and sit for 6 hours subject to a sit/stand option at will; and avoid even moderate exposure to poorly ventilated areas, smoke, dust, gasses, odors, unprotected heights, walking on uneven terrain, and all use of moving machinery.  *Id.*

At step four, the ALJ found Laidlaw could not perform any of his past relevant work. Tr. 21.  At step five, based on the VE's testimony, the ALJ determined that Laidlaw could perform sedentary jobs that exist in significant numbers in the national economy, including electronics bonder, touch up screener, and table worker.  Tr. 22.  The ALJ therefore concluded that Laidlaw is not disabled.  *Id.*

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld

if it is "'supported by inferences reasonably drawn from the record.'"  *Tommasetti v. Astrue*, 533

F3d 1035, 1038 (9th Cir 2008), quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190,

1193 (9th Cir 2004); *see also Lingenfelter*, 504 F3d at 1035.

## DISCUSSION

Laidlaw asserts that the ALJ erred by:  (1) rejecting his subjective symptom testimony;

(2) rejecting the medical opinion of his treating physician, Dr. Wenner; and (3) concluding at

step five that he could perform work in the national economy.

## I.    Laidlaw's Testimony

The ALJ acknowledged that Laidlaw had "significant back symptoms, requiring two

surgical procedures" which precluded him from working for a period of time, but found "a dearth

of medical evidence" that his symptoms "remained significantly symptomatic" to preclude

sedentary work for 12 months or more.  Tr. 18.  For the "intervening period," he had "concerns

regarding [Laidlaw's] credibility and the reliability of his allegations."  *Id.*  Due to the "lack of

medical evidence supporting [his] claims and the inconsistencies in [his] statements and actions,"

the ALJ was "unable to afford his allegations full weight."  Tr. 20.  Laidlaw contests this finding.

The Ninth Circuit has developed a two-step process for evaluating the credibility of a

claimant's own testimony about the severity and limiting effect of the claimant's symptoms.

*Vasquez v. Astrue*, 572 F3d 586, 591 (9th Cir 2009).  First, the ALJ "must determine whether the

claimant has presented objective medical evidence of an underlying impairment which could

reasonably be expected to produce the pain or other symptoms alleged."  *Lingenfelter*, 504 F3d

at 1036.  Second, "if the claimant meets the first test, and there is no evidence of malingering,

'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

specific, clear and convincing reasons for doing so.'"  *Id*, quoting *Smolen v. Chater*, 80 F3d

1273, 1281 (9th Cir 1996). The ALJ's overall credibility determination may be upheld even if not all of the ALJ's reasons for rejecting the claimant's testimony are supported by substantial evidence. *Batson*, 359 F3d at 1197.

Here Laidlaw presented objective medical evidence of an underlying back impairment that could produce his alleged symptoms, and the record contains no evidence of malingering. Therefore, the ALJ was required to provide clear and convincing reasons to reject his testimony about the severity of his symptoms.

The ALJ first rejected Laidlaw's testimony because "[t]here simply is not enough medical evidence to make his allegations credible." Tr. 20. In that regard, the ALJ found that Laidlaw's "level of medical treatment since May 2010 went from less aggressive to nonexistent." *Id.* In particular, he explained that Laidlaw "has undergone no further surgeries, and the frequency of his back related treatment has declined to essentially nothing. In fact, [he] advised the April 2012 state agency examining medical consultant [Dr. Nolan] that he was no longer taking prescription pain or back targeted medications." *Id*, citing Tr. 464.

An unexplained failure to seek consistent treatment is a clear and convincing reason for rejecting a claimant's testimony. *Burch v. Barnhart*, 400 F3d 676, 681 (9th Cir 2005); *see also* SSR 96–7p, available at 1996 WL 374186. However, the ALJ's characterization of Laidlaw's treatment after May 2010 as "nonexistent" and "essentially nothing" is not supported by the record. Laidlaw continued to receive treatment after May 2010, including a referral in December 2010 for consideration of a spinal implant stimulator, a SPECT scan in January 2011, and a medial branch block in March 2011. In August 2011, Dr. Wenner concluded that there were no other options to explore except the continued use of narcotics. Tr. 459.

The ALJ also failed to acknowledge that Laidlaw lost his medical insurance by July 2010 which limited his treatment. Tr. 326. He was unable to afford to see his doctor, obtain medication, have therapy, or spinal cord simulation. Tr. 63, 459, 464. Although he did continue to actively seek and receive some treatment from Dr. Wenner during the relevant period, he received less treatment than he might have wanted, including the spinal implant simulator. Although the ALJ noted that Laidlaw did not undergo the pre-implantation psychology screening required for the implant (Tr. 18), the reason was due to the prohibitive "projected expense of the temporary or implantable stimulator" and Laidlaw's lack of medical insurance (Tr. 464), which Dr. Nolan found credible. Tr. 466. The ALJ erred by discrediting Laidlaw for not obtaining treatment he could not afford. *Orn v. Astrue*, 495 F3d 625, 638 (9th Cir 2007).

The ALJ also expressed "heightened" concerns due to Laidlaw's "physical therapy records which reflect that he missed numerous sessions because he reported that he needed to attend 'vacations' and needed 'to go to barbecues/parties'" and helping "move people to Coos Bay." Tr. 20, citing Tr. 295, 323. These comments in the physical therapy records date between June and September of 2009, prior to the two surgeries which confirmed disc herniation and an "extremely swollen" nerve root and during a time that the ALJ agrees Laidlaw was unable to work. Tr. 346, 349-50. Simply because Laidlaw missed some appointments in 2009 is not a clear and convincing reason to reject Laidlaw's allegations of pain in later years.

The ALJ further relied on "the complete absence" of medical treatment after the branch block injection as "strongly suggest[ing] that it was effective in relieving [Laidlaw's] symptoms." Tr. 18. The ALJ's conclusion is directly contradicted by Dr. Wenner's August 4, 2011, letter written months after the medial branch block, that The Center "felt he was a candidate for an electrical stimulator trial; however, they have not been successful in getting this

approved by the insurance company." Tr. 459 (emphasis added).  The orthopedist from The

Center who administered the branch block, Dr. Post, opined that"

> [p]rior to considering spinal cord stimulation it would be reasonable to
> proceed with medial branch block, left L4-5, and left L5-S1, based on
> results of [the] SPECT scan.  If he has positive concordant pain relief, we
> would consider proceeding with RFA procedure.  If however, medial
> branch block does not offer pain relief, we will consider proceeding with a
> spinal cord stimulator trial.

Tr. 430.

Had the branch block been successful, Laidlaw would not have been considered a

candidate for the stimulation.  In fact, Laidlaw told Dr. Nolan that the branch block provided

relief only for several days.  Tr. 464.

The record also fails to support the ALJ's conclusion that Laidlaw's symptoms did not

persist for 12 months or more.  Tr. 18.  Dr. Wenner continued to actively treat Laidlaw for

almost two full years, with no substantial improvement in his functional abilities, and continued

to describe him as very impaired until his last visit in August 2011.  Tr. 459.

In addition, the ALJ cited Laidlaw's allegations of disabling pain and limitations as

unsupported by the objective medical findings.  Tr. 18.  Inconsistency with objective medical

evidence is a clear and convincing reason for rejecting a claimant's testimony.  *Tommasetti*, 533

F3d at 1040.  The findings of the December 2010 MRI and March 2011 SPECT scan constitute

objective evidence to support Laidlaw's continuing symptoms.  However, the ALJ credited the

opinion of Dr. Nolan who observed "no motor or reflex loss" with negative straight leg raising

tests, and opined that he was "capable of performing lifting at the light exertion level and

standing and walking somewhere between light and sedentary level."  Tr. 18, 466.  As the ALJ

noted, Dr. Nolan observed other findings that are consistent with Laidlaw's allegations of

disability, including a slightly antalgic gait and residual sensory deficit with decreased sensation

in the thigh and calf and a portion of the left foot. Tr. 18, 465-66. In addition, as discussed

below, the ALJ erred by rejecting the opinion of Dr. Wenner in favor of Dr. Nolan's opinion.

As his second reason to discredit Laidlaw, the ALJ noted several inconsistencies in his

statements and actions. Tr. 20-21. A claimant's inconsistent statements about his condition

provide a clear and convincing for rejecting his testimony. *Tommasetti*, 533 F3d at 1040.

In support of this reason, the ALJ cited the normal cardiac stress testing conducted by

Rajesh Ravuri, M.D., on April 9, 2012, reflecting that Laidlaw had "good exercise tolerance."

Tr. 20, 481. The ALJ found that this "exceptional exercise capacity is hard to reconcile with

[Laidlaw's] claims of long-term profound symptoms and limitations." Tr. 20. However, the

cardiac stress test was intended to diagnose the cause of Laidlaw's chest pain that brought him to

the emergency room on April 6, 2012. Tr. 487. The results of the stress test and other diagnostic

cardiac testing were normal (Tr. 479-98) and irrelevant to his back pain. The emergency room

physicians' knowledge from intake of Laidlaw's chronic pain did not influence their choice of

diagnostic testing or impression of his response to the stress test. Furthermore, his ability to

sustain vigorous activity for less than nine minutes before getting tired (Tr. 481) does not conflict

with his testimony that he cannot stay in one position for long, has to sit or lie down to relieve

pain and can walk for 30 minutes. Tr. 61-62.

The ALJ also stated that Laidlaw told one treating source that physical therapy "made his

symptoms worse," in contrast to the physical therapy records which "demonstrate medical

improvement." Tr. 20. Although the records showed some improvements in terms of core

stabilization and abdominal strength, they also reveal that Laidlaw reported increased leg and

back pain. Tr. 323.

The ALJ also noted "serious inconsistencies with respect to [his] work history reporting and his commitment towards work." Tr. 20. When Laidlaw first applied for benefits, he identified only four jobs between 1998 and 2005, but a month later identified eight occupations between 2001 and 2008 which the ALJ found "difficult to reconcile." *Id.* Laidlaw listed four jobs on the response to "Section 6-Job History" on a Disability Report dated July 16, 2010. Tr. 187. The instructions stated: "List the jobs (up to 5) that you had in the 15 years before you became unable to work." *Id*. It did not ask him to list every job he had in the 15 years prior to his alleged onset of disability. In contrast, on the Work History Report, the instructions asked Laidlaw to "list all the jobs that you have had in the 15 years before you became unable to work." Tr. 202. By listing eight jobs, Laidlaw was not inconsistent with his earlier report.

Next, the ALJ stated that when applying for benefits, Laidlaw claimed that he last worked on May 14, 2009, and stopped working because of his medical condition, while the earnings record shows that he last worked in 2008, not 2009, and then only nominally. Tr. 20. This is not a clear and convincing reason. It is unknown whether the earnings record in this case is complete, but even if they are, Laidlaw did not claim that he worked for the company 40 hours a week without periods of unemployment.

The ALJ further stated that Laidlaw reported working full-time on two jobs between April 2003 and June 2004 and between December 2004 and May 2005. Tr. 20. If true, he surmised that his wages should have been nearly $30,000.00 in 2003 and $25,000.00 in 2005, in contrast to his reported earnings of $10,837.00 in 2003 and $17,000.00 in 2005. Tr. 20-21. The ALJ's assertion is based on the Work History Report. Tr. 202-09. However, that report shows that Laidlaw reported working at DB Western between April of 2003 and January of 2004, and at a mill between September of 2002 and March of 2004. Tr. 202. While employed in each job, he

worked full-time, five days a week, eight hours a day.  Tr. 207, 208.  However, he did not claim

that he worked these jobs at the same time for 16 hours a day or that he worked every day.

Instead, it is reasonable to conclude based on the type of work performed and in light of the

economy, that he worked at both of these places when work was available.  The ALJ could have

clarified this issue at the hearing, but chose not to do so.

Finally, noting that Laidlaw had never earned more than $17,505.00 in a year, the ALJ

concluded that he "inconsistently reported his work history" and "also overstated his

commitment towards work."  Tr. 21.  However, nothing in the record indicates that Laidlaw was

attempting to pretend to have a better work history than he does.

Finally, the ALJ found that Laidlaw's testimony regarding the nature and severity of his

limitations was contradicted by evidence of his daily activities, including "fourwheeling,

camping, hunting, and playing with his children."  Tr. 21, citing Tr. 443.  A claimant's daily

activities can provide a clear and convincing reason for rejecting his subjective symptom

testimony when they conflict with that testimony.  *Molina v. Astrue*, 674 F3d 1104, 1113 (9th Cir

2012).  However, the ALJ overstated Laidlaw's daily activities.  On the Function Report,

Laidlaw wrote that his hobbies and interests included playing with his kids and walking, but he

could not do that very much because it hurt too much.  Tr. 198.  He also liked to go camping and

hunting when he could, but he could not go anymore because it hurt too much.  Tr. 198-99.

Simply because Laidlaw described his hobbies as "4-wheeling, camping, hunting, playing with

children" (Tr. 443) does not indicate to what extent he is able to do them.  There is no evidence

in the record that he participated in any camping or hunting during the relevant period.

In sum, the ALJ failed to give clear and convincing reasons supported by substantial

evidence in the record for rejecting Laidlaw's testimony.

II.    **Medical Opinion of Dr. Wenner**

The ALJ considered Dr. Wenner's July 2010 and August 2011 opinions, but declined to afford them "significant weight." Tr. 18-19. Laidlaw contests this finding, arguing that the ALJ failed to provide legally sufficient reasons for rejecting Dr. Wenner's opinions.

The ALJ is responsible for resolving conflicts in the medical record, including conflicts among physicians' opinions. *Carmickle v. Comm'r*, 533 F3d 1155, 1164 (9th Cir 2008). The Ninth Circuit distinguishes between the opinions of treating, examining, and non-examining physicians. The opinion of a treating physician is generally accorded greater weight than the opinion of an examining physician, and the opinion of an examining physician is accorded greater weight than the opinion of a non-examining physician. *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995). An uncontradicted treating physician's opinion can be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F2d 1391, 1396 (9th Cir 1991). In contrast, if the opinion of an examining physician is contradicted by another physician's opinion, the ALJ must provide "specific, legitimate reasons" for discrediting the examining physician's opinion. *Lester*, 81 F3d at 830.

As his first reason, the ALJ stated that "Dr. Wenner's assessments were rendered at the point his treatment of [Laidlaw] effectively ended . . . in November 2010," and, except for the early 2011 evaluation for a spinal cord stimulator, "from a prospective point of view, there was little medical evidence to support his extreme opinion." Tr. 19. However, Dr. Wenner's treatment of Laidlaw did not end until August of 2011. Tr. 459. In November 2010, he ordered another MRI, and the next month he referred Laidlaw to Drs. Ugalde and Swift who examined him, performed a SPECT scan, and administered a branch block. Tr. 429, 432, 449, 460.

Next, the ALJ stated that "the subsequent lack of treatment, and [Laidlaw's] own admission that he is no longer taking any back related prescription medications, also strongly suggests that Dr. Wenner's functional assessments . . . were overly aggressive." Tr. 19. However, as discussed above, the ALJ failed to acknowledge that Laidlaw could not afford medication or further treatment due to the loss of medical insurance and that he could not tolerate many medications. Tr. 464 (epidural injections and morphine caused vascular headaches).

The ALJ also noted the results of Laidlaw's cardiac stress test. However, as discussed above, this nine minutes of activity shows nothing about Laidlaw's ability to sustain work or Dr. Wenner's finding that he must recline during the day to relieve pain.

The ALJ added that "neither the state agency evaluating or examining medical consultants [Martin Kehrli, M.D., and Neal E. Berner, M.D.] support such an extreme assessment," and that Dr. Nolan "was in a better position to evaluate [Laidlaw's] entire medical history because he examined [him] and reviewed the record well after [Laidlaw] ceased all back related medical care." Tr. 19. Neither of these reasons is legitimate. The state agency doctors reviewed the case in October of 2010 (Tr. 211-30, 239-60) and were unaware of the subsequent SPECT scan and MRI results. In contrast, Dr. Wenner considered these results and examined Laidlaw in August of 2011. Tr. 459. Dr. Nolan is a cardiologist and internist, as compared to Dr. Wenner, who is an orthopedic surgeon. As a specialist in the area, Dr. Wenner's opinion should be given greater weight. *Benecke v. Barnhart*, 379 F 3d 587, 594 n4 (9th Cir 2004); 20 CFR § 404.1527(d)(5). Furthermore, Dr. Nolan did not address the results of the SPECT scan. Tr. 464. And even though he relied on Laidlaw's ability to sit in a comfortable position for 30 to 45 minutes at one time, he did not explain how Laidlaw can sit for six hours a day especially

when he spends "most of his day standing and moving around" (Tr. 464, 466) or address

Dr. Wenner's assessment that Laidlaw needs to lie down or rest every one to two hours.  Tr. 425.

Thus, the ALJ's reasoning for rejecting Dr. Wenner's opinions is legally insufficient.

## IV.    <u>Remand</u>

The decision whether to remand for further proceedings or for immediate payment of

benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir

2000), *cert. denied*, 531 US 1038 (2000).  The issue turns on the utility of further proceedings.

A remand for an award of benefits is appropriate when no useful purpose would be served by

further administrative proceedings or when the record has been fully developed and the evidence

is insufficient to support the Commissioner's decision.  *Strauss v. Comm'r*, 635 F3d 1135,

1138-39 (9th Cir 2011).  The court may not award benefits punitively and must conduct a "credit-

as-true" analysis to determine if a claimant is disabled under the Act.  *Id* at 1138.

Under the "crediting as true" doctrine, evidence should be credited and an immediate

award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for

rejecting the evidence; (2) there are no outstanding issues that must be resolved before a

determination of disability can be made; and (3) it is clear from the record that the ALJ would be

required to find the claimant disabled were such evidence credited."  *Id*.  The "crediting as true"

doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in

determining whether to enter an award of benefits upon reversing the Commissioner's decision.

*Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003), citing *Bunnell v. Sullivan*, 947 F2d 341,

348 (9th Cir 1991).  The reviewing court declines to credit testimony when outstanding issues"

remain.  *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

As discussed above, the ALJ erred by rejecting Laidlaw's testimony and Dr. Wenner's opinions.  Thus, that evidence should be credited as true.  *See Harman*, 211 F3d at 1179; *Smolen*, 80 F3d at 1281-83; *Varney v. Sec'y of Health & Human Servs.*, 859 F2d 1396, 1398 (9th Cir 1988).

Turning to the other two facets of the *Harman* inquiry, this court finds no outstanding issues that must be resolved before a determination of disability can be made, and the record is clear that the ALJ would be required to find Laidlaw disabled if the evidence is credited.  At the hearing, the VE testified that the need to lie down during the day would rule out all forms of work.  Tr. 42.  According to Dr. Wenner, Laidlaw needs to lie down or rest every one or two hours because of back and leg pain.  Tr. 425.  If that opinion is credited, then Laidlaw must be found disabled.  In addition, Laidlaw testified that he needs to shift positions and cannot stay in one position for long.  Tr. 62.  When he gets too sore and cannot move, then he sits down or lies down.  *Id*.  He spends half an hour or so doing this, trying to find a position that he can lie in or sit in to keep from hurting.  *Id*.  If that testimony is properly credited, the Laidlaw must be found disabled.

Accordingly, this case is remanded for the immediate payment of benefits.

## <u>ORDER</u>

For the reasons discussed above, the Commissioner's decision is REVERSED AND REMANDED pursuant to Sentence Four of 42 USC § 405(g) for an award of benefits.

DATED this 16th day of January, 2015.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge